Lydia A. ANTWEILER, Respondent,

v.

PRUDENTIAL INSURANCE COMPANY
OF AMERICA, a corporation,
Appellant.

No. 22388.

Kansas City Court of Appeals.

Missouri.

May 7, 1956.

James T. Blair, Jr., Tweedie Fisher, Jefferson City, Fordyce, Mayne, Hartman, Renard & Stribling, William W. Sleater, Jr., St. Louis, for appellant.

Lauf, Bond & Dominique, John O. Bond, P. Pierre Dominique, Jefferson City, for respondent.

CAVE, Judge.

This is a suit brought by the plaintiff-respondent to collect a double indemnity benefit claimed to be due her on a policy of insurance issued by the defendant-appellant upon the life of her deceased husband, Michael Antweiler, and in which policy she was named the beneficiary. The amount involved is less than $7,500, and this court has jurisdiction.

The cause was tried to a jury and at the close of plaintiff's evidence, the court sustained defendant's motion for a directed verdict and ordered the jury to return a verdict in accordance therewith. Plaintiff filed a motion for new trial which was sustained, "because the court erred in sustaining defendant's motion for a directed verdict, * * * for the reason that plaintiff adduced sufficient competent and substantial evidence to require the court to submit plaintiff's case to the jury for its determination of the question whether plaintiff was entitled to recover." The defendant perfected its appeal from this order.

It is conceded that the defendant issued its policy of insurance in the amount of $1,000 upon the life of Michael H. Antweiler; that the plaintiff was the beneficiary named therein; that the policy provided for the payment of an additional amount of $1,000 if the death of insured occurred, "as a direct result, directly and

independently of all other causes, of bodily injuries, effected solely through external, violent and accidental means of which * * * there is a visible contusion or wound on the exterior of the body, etc." Plaintiff made due proof of death and the defendant paid the principal of the policy but refused to pay for double indemnity.

The sole question is whether plaintiff's evidence was sufficient to make a submissible issue of Antweiler's accidental death within the provisions of the policy. In determining this issue, we must take plaintiff's evidence as true, unless it is entirely unreasonable or opposed to physical laws, and give her the benefit of all favorable inferences arising from all the evidence and reject unfavorable inferences. The cause may not be withdrawn from the jury unless the facts in evidence and the legitimate reasonable inferences which may be drawn therefrom are so strongly against plaintiff as to leave no room for reasonable minds to differ. DeLay v. Ward (en banc), 364 Mo. 431, 262 S.W.2d 628, 633.

The evidence is that Antweiler was 66 years of age at the time of his death on March 23, 1953. He was a carpenter by trade and had been for more than 25 years; he was 5 feet 10 inches in height and weighed approximately 205 pounds. His wife and other witnesses testified that he was in good health; that he worked steadily at his trade; that he had not lost more than 3 or 4 days from his work due to illness for the past 25 years and had not been under the care of a physician during that time. On the day of his death, he was doing carpenter work at a convent, being erected at the Visitation Catholic Church at Vienna, Missouri, where he had been working since September of the preceding year. Each day he drove his automobile from his home in Jefferson City to Vienna and back, a distance of approximately 90 miles round trip. On the morning of his death he left home about 6:30 and was apparently in good health and spirits. After arriving at his place of employment he did different types of work, and about 9:30 A.M., he was standing on a "scaffold", which consisted of two boards extending from an iron railing along one side of the porch of the building to a "saw horse" on the opposite side of the porch, which scaffold was 4½ or 5 feet above the floor of the porch. It appears from photographs introduced in evidence that the floor of the porch was approximately 30 inches above the ground. His hands were extended to the ceiling for making a measurement, and he was looking upward. One of his co-workers, who was nearby, testified that "he (Antweiler) was standing on the scaffold and one of the two boards broke and I don't know whether he fell inside or straddle of the railing and he toppled over the bannister or railing and down. * * * Landed on his head. * * * Q. Did you observe a plank breaking? A. I did."

The pastor of the church, Father Nardoni, was standing nearby watching the work and described the occurrence: "Well, he was up with his hands stretched up in the ceiling and all of a sudden I saw him like losing his balance and then down he went and I heard the crack. Q. The crack of the plank? A. Yes. Q. Did you notice the plank going down? A. No, I didn't. I just heard the crack and the next thing I saw him head first on the ground so I didn't pay any attention to this and I rushed over and saw what his conditions were. * * * I saw him hitting the rail and he started over. * * * Head first. * * * I couldn't say the plank was completely broken in two. * * * It gave away. It didn't break clean." This witness also testified that just before Antweiler fell he had noticed "those boards kinda give * * * springing a little and I said, 'Be careful, Mike, I don't trust them boards.'" He further testified that as Antweiler fell, "he hit the railing and then down with his head". He went immediately to Antweiler and found him "gasping a little". He slapped his face but got no response, or evidence of consciousness, and administered the last rites of the

church within two or three minutes. He couldn't say whether Antweiler was dead at that time.

Mr. White, city marshal of Vienna, was about a block and a half from the scene of the accident and went immediately and found Antweiler lying on the ground on his back beside the porch. He observed that he was gasping or trembling and he went immediately to get Mrs. White, who is a nurse. She came with ammonia and administered inhalant immediately; she also felt his pulse, which was very weak and within about two minutes after her arrival, the pulse ceased. She had Antweiler's head in her hands and lap and noticed "his neck seemed very lax", but she did not recall noticing anything unusual in regard to the bones of his neck when she moved his head.

There was a bruise on the right side of his forehead and some pieces of dirt or rock embedded in the flesh. He was placed in an ambulance and taken to a hospital in Jefferson City where Dr. Schull examined him only to see whether he was alive or dead, and found that he was dead. He did not estimate how long he had been dead.

Defendant strenuously argues that there is no evidence of what caused Antweiler's death; and that the cause of his death cannot be left to speculation or conjecture or be established by piling one inference upon another.

■ It is universally held that an essential element of a plaintiff's case cannot be left to guess or conjecture, or be established by piling inferences. The cases cited by defendant announce those general principles, but the application of such principles must be considered in connection with the facts of each case. Defendant cites: Laessig v. Travelers' Protective Ass'n, 169 Mo. 272, 69 S.W. 469; Stafford v. New York Life Ins. Co., Mo.App., 248 S.W.2d 76; Pettit v. United Benefit Life Ins. Co., Mo.App., 277 S.W.2d 857; Freeman v. Loyal Protective Ins. Co., 196 Mo. App. 383, 195 S.W. 545; Wright v. Order

of United Commercial Travelers, 188 Mo. App. 457, 174 S.W. 833; Atherton v. Railway Mail Ass'n, Mo.App., 221 S.W. 752; Christianson v. Metropolitan Life Ins. Co., Mo.App., 102 S.W.2d 682; Klinginsmith v. Mutual Benefit Health & Accident Ass'n, 228 Mo.App. 229, 64 S.W.2d 705; Mayhew v. Travelers Protective Ass'n of America, Mo.App., 52 S.W.2d 29; Schmohl v. Travelers' Ins. Co., Mo.App., 177 S.W. 1108; Waldron v. Skelly Oil Co., 363 Mo. 1146; 257 S.W.2d 615; Pape v. Aetna Casualty & Surety Co., Mo.App., 150 S.W.2d 569; Draper v. Louisville & N. R. Co., 348 Mo. 886, 156 S.W.2d 626.

■ We have carefully examined these cases and find that the factual situation in each makes them inapplicable and not controlling. It would serve no useful purpose to analyze and distinguish each opinion. But to illustrate the inapplicability of such cases, we note that in Pettit v. United Benefit Life Ins. Co., supra, after reviewing the evidence the court said, 277 S.W.2d 865: "Under this testimony we find that the plaintiff failed to offer substantial evidence that the deceased fell; [or] that there was circumstantial evidence that the accident, if any, caused his death. * * *" That is not the situation in the instant case. In the Stafford case, supra, the evidence disclosed that the deceased had been suffering for years from a severe heart ailment and extreme high blood pressure, and we held that the evidence was not sufficient to show whether the deceased died from a fall or from a seizure. Such an issue does not exist in the present case.

Of course, there must be some evidence of the cause of death in this kind of case, because proof of death alone is not sufficient. But in the Laessig case, supra, wherein the court was discussing the question of accidental death under a policy with provisions similar to those of the present policy, the court said, 169 Mo. 281, 69 S.W. 471: "The jury must determine the fact as to what caused the death. There need not necessarily be direct proof or evidence of the cause. The cause may be found by the jury from facts and circumstances". This is but a recognition of the well estab-

lished rule that an essential fact may be established by proof of other facts and circumstances from which such fact may be properly inferred.

In Wills v. Berberich's Delivery Co., 345 Mo. 616, 134 S.W.2d 125, 129, it is said: "The rule prohibiting the piling of inferences is applied when necessary to guard against attenuated reasoning, as where an initial inference is drawn from a fact, and other inferences are built solely and cumulatively upon the first, so that the conclusion reached is too remote and has no sound logical foundation in fact. * * * But after all, the underlying question is whether the conclusion hypothesized can fairly be drawn from the proven facts by reasonably intelligent minds. * * * The logical processes involved cannot be governed by an inflexible rule. * * * Sometimes, also, it is said the same fact raises several *concurrent* inferences, thus avoiding the objection that they are piled. It is well settled that any number of inferences may be drawn in a given case so long as each has a factual foundation."

With these principles in mind, what are the undisputed facts in the instant case? They are to the effect that Antweiler was, and had been for many years, a strong, healthy, active, hard working man; that during the morning of the accident he appeared in good health, active and vigorous; that he was standing on a "scaffold" when one of the boards "cracked" or "broke" and he fell across an iron railing, then to the ground, striking his head first; that he was 5 feet 10 inches in height, and weighed about 205 pounds; that the scaffold was 4½ or 5 feet above the floor of the porch; that the floor of the porch was approximately 30 inches above the ground, consequently his head was 12½ or 13 feet above the ground; that after falling he showed no signs of consciousness; that there was a bruised place on the right side of his head and dirt or rocks embedded in the flesh; and that he died within a few minutes after the fall.

We think these facts and the favorable inferences to be drawn therefrom clearly make a submissible issue of accidental death within the provisions of the policy. The rules against submission of issues based on guess or speculation or the piling of inferences have no application under the facts.

The order sustaining the motion for new trial is affirmed.

All concur.